Filed 10/7/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al.<br><br>        Petitioners,<br><br>    v.<br><br>SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>        Respondent.<br><br>KATHERINE ROSEN,<br><br>        Real Party in Interest. | B259424<br><br>(Los Angeles County Super. Ct. No. SC108504) |

ORIGINAL PROCEEDINGS in mandate. Gerald Rosenberg, Judge. Petition for writ of mandate granted.

Maranga Morgenstern, Kenneth A. Maranga, Paul A. Elkhort, Morgan A. Metzger and Dennis Newitt; Greines, Martin, Stein & Richland, Timothy T. Coates and Feris M. Greenberger; University of California Office of the General Counsel, Charles F. Robinson, Karen J. Petrulakis and Normal J. Hamill; University of California, Los Angeles and Kevin S. Reed for Petitioners.

Reed Smith, Paul D. Fogel and Dennis Peter Maio for The California Community Colleges, California Institute of Technology, California State University, Chapman University, Claremont McKenna College, Pepperdine University, Pitzer College, Pomona College, Stanford University and The University of Southern California, as amici curiae on behalf of Petitioners.

Munger, Tolles & Olson, Brad S. Phillips and Grant Davis-Denny for JED Foundation, American College Counseling Association and NASPA: Student Affairs Administrators in Higher Education, as amici curiae on behalf of Petitioners.

No appearance for Respondent.

Alan Charles Dell'Ario; Panish, Shea & Boyle, Brian Panish and Deborah S. Chang for Real Party in Interest.

The Arkin Law Firm and Sharon J. Arkin for Consumer Attorneys of California, as amicus curiae on behalf of Real Party in Interest.

_____

Katherine Rosen, a student at the University of California, Los Angeles (UCLA), suffered severe injuries after being attacked by another student, Damon Thompson, during a chemistry laboratory. Several months before the attack, the school had treated Thompson for symptoms indicative of schizophrenia disorder, including auditory hallucinations and paranoid thinking. Rosen filed a negligence action against the Regents of the University of California and several UCLA employees alleging that defendants had breached their duty of care by failing to adopt reasonable measures that would have protected her from Thompson's foreseeable violent conduct. Defendants moved for summary judgment, arguing that public colleges and universities and their employees do not have a legal duty to protect adult students from third party criminal misconduct.

The trial court denied the motion, concluding that defendants owed Rosen a duty of care based on her status as a student and, alternatively, as a business invitee onto campus property. The court further concluded there were triable issues of fact whether UCLA had voluntarily undertaken a duty to protect Rosen by providing mental health treatment to Thompson. Defendants filed a petition for writ of mandate and we issued an order to show cause. We now grant defendants' petition, concluding that a public university has no general duty to protect its students from the criminal acts of other students.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Summary

#### 1. Events preceding Thompson's mental health treatment

Damon Thompson transferred to UCLA in the fall of 2008. Shortly after enrolling in classes, Thompson sent several emails to his history professor, Stephen Frank, reporting that he was "angered" by "offensive" remarks other students had made to him during an examination. Thompson asserted that he was "outrage[d]" because he believed the students' conduct had affected his academic performance. Frank forwarded the emails to the chairman of the history department, who advised Frank to try to calm Thompson. The chairman also advised Frank to refer Thompson to "psychological services" if he believed Thompson was "genuinely paranoid or a potential threat."

In January of 2009, Thompson wrote a three-page letter to Robert Naples, the Dean of Students, alleging that a female resident in his dormitory had made "unwelcomed verbal sexual advances" toward him. Thompson also complained that other residents had made "accusations of a sexual nature about [him]"; questioned his "intelligence"; "disrupt[ed] his sleep cycle"; and "invaded [his] privacy" by distributing his "personal information . . . via rumors." Thompson warned Naples that if the university failed to discipline the responsible parties, the matter would likely "escalate," causing Thompson to "act[] in a manner that will incur undesirable consequences." Thompson was transferred to a new dormitory one week after writing the letter.

Several weeks later, Thompson sent emails to three other professors and teaching assistant Jenny Hernandez complaining that other students were "attempting to distract [him] . . . by making offensive comments." Hernandez sent multiple emails to her supervising professor reporting that she had never heard any students insult Thompson and believed he might have psychological problems. According to Hernandez, Thompson was "withdrawn," frequently "talk[ed] to himself" and appeared "unstable." Hernandez believed his behavior was symptomatic of schizophrenia.

Assistant Dean of Students Cary Porter was notified of Thompson's situation and contacted Karen Minero, a member of UCLA's "Consultation and Response Team"

3

(CRT). The CRT was responsible for providing advice and consultation to campus members who had concerns about the well-being of students. Porter also met with Thompson and encouraged him to seek medical help at UCLA's Counseling and Psychological Services (CAPS).

On February 28, Thompson informed the resident director of his dormitory he had "heard a clicking sound that he believed to be a gun" and had previously heard "other residents talk about having a gun and shooting him." Thompson told the resident director that, in response to these incidents, his father had advised him that he could "hurt the other residents." Although Thompson had "thought about it," he decided he "wasn't going to do anything."

The resident director contacted the campus police, who interviewed Thompson and conducted a search of the room where the clicking noise had allegedly originated. After finding no weapon, the officers informed the director that they thought Thompson "needed a mental evaluation." Thompson agreed to be voluntarily escorted to the UCLA emergency room for a psychiatric evaluation. During the examination, Thompson complained of auditory hallucinations, paranoid thinking and a history of depression. In describing his symptoms, Thompson reported that he felt people were insulting him and heard "'people talk to [him] when there is no one there.'" Medical examiners diagnosed Thompson with paranoid delusions and possible schizophrenia disorder, but concluded he did not exhibit any signs of suicidal or homicidal ideation. Although Thompson rejected voluntary hospitalization for treatment, he agreed to begin taking antipsychotic drugs and to attend outpatient treatment at CAPS.

The resident director informed Cary Porter and the CRT about Thompson's dormitory incident and his subsequent mental evaluation. The CRT discussed Thompson at a meeting on March 9, 2009, noting that although he had repeatedly complained of verbal harassment he had never identified any individual students.

## 2. *Thompson's mental health counseling at CAPS*

On March 11th and 12th, Thompson began treatment at CAPS, attending two sessions with psychologist Nicole Green. Although Green believed Thompson was suffering from schizophrenia, she concluded that he did not exhibit suicidal or homicidal ideation and had not expressed any intent to harm others. During a third session on March 18th, Thompson told Green he would not meet with a psychiatrist to discuss possible medications for his condition until he was able to determine whether the voices he was hearing were real. Thompson expressed frustration that nobody believed he was hearing voices and stated that he would try to record them.

At a fourth meeting on March 26th, Thompson told Green he did now believe he was experiencing auditory hallucinations and was amenable to a psychiatric evaluation. Thompson also reported that he continued to feel harassed by other students in his dormitory, which made him angry, but denied experiencing suicidal or homicidal ideation. Later the same day, Thompson met with CAPS psychiatrist Charles McDaniel and again denied experiencing suicidal or homicidal ideation. Thompson did, however, inform McDaniel he had previously experienced general "ideations of harming others," clarifying that he had never formulated an actual plan to harm anyone and never identified a specific victim. Thompson refused McDaniel's recommendation of voluntary hospitalization, but agreed to take psychotropic medications. McDaniel discussed Thompson with numerous CAPS staff members, who all agreed the patient did not meet the criteria for an involuntary psychiatric hold.

Thompson attended several additional CAPS sessions in April of 2009. On April 10th, Thompson informed Green he did not believe he needed to take his psychotropic medications and remained adamant that he had been a victim of harassment. A week later, Thompson told Green he was still experiencing occasional bouts of anger caused by "insults and harassment," but assured Green he had "no intention to act on impulse to harm physically, even if he feels like it." On April 24th, Thompson told McDaniel he intended to stop taking his medications. During each of his April sessions, Thompson consistently denied suicidal or homicidal ideations and denied having any intent to harm

others.  On April 27th, Thompson failed to attend a scheduled CAPS session and terminated his treatment shortly thereafter.

### 3. *Thompson's behavior during the summer and early fall of 2009*

On June 3, 2009, Thompson was involved in an altercation at his dormitory. According to the campus police report, Thompson had knocked on the door of a sleeping resident, accused him of making too much noise and then pushed him.  When the resident informed Thompson he had not been making any noise, Thompson pushed him again, stating "this is your last warning."  As a result of the incident, Thompson was expelled from university housing and ordered to return to CAPS when the fall semester began.

Later in the summer semester, Thompson sent letters to two chemistry professors alleging that students and university personnel had made derogatory comments toward him.  Although the letters named several individuals who were allegedly involved in the incidents, Thompson reported that he intended to "to ignore [the comments], refrain [from] reacting and persist in producing the highest quality of work possible."  When the fall semester started, Thompson made similar complaints to chemistry professor Alfred Bacher.  In an email sent September 29th, Thompson complained that he had obtained "poor results" with an experiment due to "disruption caused by other students in the lab."

On September 30th, Thompson attended a CAPS session that the university had mandated as part of his discipline for the June dormitory incident.  Thompson met with Tanya Brown, who reported that Thompson displayed a guarded attitude, slowed speech, delusional thought processes and impaired insights.  Thompson told Brown he still "occasionally" heard "voices of other students having 'malice' toward him and making critical and racist comments."  Thompson assured Brown he did not experience any impulsive thoughts or behaviors in response to the voices, had no intent to harm anyone (including those who had criticized him) and did not believe he had ever harmed anyone in the past.  Thompson also met with McDaniel, who found Thompson to be guarded in discussing his condition.  Thompson told McDaniel he now believed that some of his prior symptoms were the result of actual acts of racism or discrimination, rather than

6

hallucinations. McDaniel recommended that Thompson start receiving treatment at UCLA's clinic for behavioral health services, which he agreed to do.

### 4. *Thompson's assault on Katherine Rosen*

On October 6th, chemistry teaching assistant Adam Goetz emailed professor Becher to report "another incident" that had occurred with Thompson. According to the email, Thompson had alleged that a student called him stupid, described the student's physical appearance to Goetz and insisted that Goetz provide him the name of the student. Goetz told Thompson he had been present in the laboratory when this incident allegedly occurred and had not heard anyone say anything derogatory about Thompson. Thompson eventually calmed down and resumed his work. Goetz told Bacher that Thompson's behavior had become a weekly "routine."

Bacher forwarded Goetz's email to Clark Porter and requested advice on how to respond. Porter contacted Minero at CRT, who expressed concern that Thompson had identified a specific "student in his class who he believe[d] [wa]s against him."[1] Minero then forwarded Porter's email to other CRT members, which included (among others) personnel at CAPS and student housing administrators.

On the morning of October 7th, CAPS, CRT and administrators from UCLA's "Office of Residential Life" attempted to schedule a meeting to discuss Thompson. Nicole Green was instructed to contact Thompson and request that he schedule a CAPS counseling appointment. Thompson responded to her by email, stating that he would try to schedule a meeting that week. Later the same day, a second chemistry teaching assistant emailed Becher to report that a "student from another section" (later identified as Thompson) had accused "students of verbal harassment, thereby inhibiting his work." The teaching assistant had been present during the incident and did not see or hear any harassment.

---

[1] The exhibits in the record do not indicate the name of the student who Thompson identified. The parties concede, however, that it was not the plaintiff.

Two days later, on the morning of October 9th, Minero met with Porter to discuss Thompson. Minero stated that she was trying to coordinate a meeting with CAPS and speak with each of Thompson's professors to "talk about the best way to handle the situation in the classroom." Minero was unsure, however, whether the Family Education Rights and Privacy Act (20 U.S.C. § 1232g) might prohibit her from sharing Thompson's medical information with other faculty members.

At approximately 12:00 p.m. that same day, Thompson was working in a chemistry laboratory when he suddenly attacked student Katherine Rosen with a kitchen knife. When campus police arrived, Thompson told them "they were out to get me" and complained that the other students had been "picking on him." Thompson also stated that he had been "provoked" by students in the "lab . . . insulting [him]," explaining that similar incidents had happened on "several occasions in the past."

Rosen told investigating officers that she had been working in the chemistry laboratory for approximately three hours prior to the attack and "did not remember having any interactions or conversation with [Thompson]." Rosen recalled kneeling down to place "equipment in her chemistry locker when she suddenly felt someone's hands around her neck." Rosen looked up and saw Thompson coming at her with a knife. Rosen said she only knew Thompson from the chemistry laboratory, and had never insulted him or otherwise provoked him in any way.

Teaching assistant Goetz informed an investigating officer that Thompson had approached him on several occasions to complain about students "calling him stupid." Goetz also stated that on one occasion Thompson had identified "Rosen as being one of the persons that called him stupid."

## B. Procedural Summary

### 1. Rosen's complaint

Rosen filed a tort action against Thompson, the Regents of the University of California and several UCLA employees, including Alfred Bacher, Cary Porter, Robert

8

Naples and CAPS psychologist Nicole Green.[2] The complaint alleged a single cause of action for negligence against the UCLA defendants (collectively UCLA), asserting that "the Regents . . . and its employees . . ., having invited [Rosen] onto the campus property and having enrolled her as a student in exchange for payment of tuition, had a special relationship existing with [Rosen] . . . wherein they had a . . . duty . . . to take reasonable protective measures to ensure her safety against violent attacks and otherwise protect her from reasonable foreseeable criminal conduct, to warn her as to such reasonable foreseeable criminal conduct on its campus and in its building and/or to control the reasonable foreseeable wrongful acts of third parties/other students."

The complaint further alleged that, prior to the date of the attack, UCLA had received numerous warnings regarding "the dangerous and violent propensities exhibited by [Thompson], the danger he posed to others and his serious need for psychological assistance and/or interventions." Despite these repeated warnings, UCLA "failed to take any action to protect its students from violent criminal attacks by [Thompson], to warn its students of potentially violent and dangerous propensities of [Thompson] and/or to control [his] reasonably foreseeable wrongful acts." Rosen alleged that as a direct and proximate result of these negligent acts, she was "violently attacked and almost murdered by [Thompson]," thereby suffering injury.

### 2. *UCLA's motion for summary judgment*

#### a. *UCLA's arguments in support of summary judgment*

UCLA filed a motion for summary judgment arguing that Rosen's negligence claim failed for three reasons. First, UCLA asserted that unlike elementary and secondary schools, colleges and universities do not have a legal duty to protect their adult students from criminal conduct perpetrated by other students. According to UCLA, the mere fact Rosen was a student or that she had been on campus property when the attack

---

2    Although not initially named in the operative second amended complaint, defendants Cary Porter, Robert Naples and Nicole Green were substituted by amendment for "Doe defendants" 1, 2 and 3.

9

occurred was insufficient to create a special relationship giving rise to a duty to protect her.

Second, UCLA argued that even if it did have a legal duty to protect its students from foreseeable criminal conduct, the undisputed evidence demonstrated that university personnel had acted appropriately in addressing the potential threat that Thompson posed to the campus community. In support, UCLA relied on two expert declarations concluding that the school had acted within the applicable standard of care and that Thompson's conduct was not reasonably foreseeable. Both experts explained that UCLA's violence prevention policies and mental health counseling met "common institutional practices for institutions of higher learning."

Third, UCLA argued that the school and its employees were immune from suit under Government Code sections 856 and 820.2, which preclude public entity liability for injury resulting from: (1) a decision "whether to confine a person for mental illness" (Gov. Code, § 856, subd. (a)); and (2) any "act or omission [that] was the result of the exercise of the discretion vested in [the public entity employee]." (Gov. Code, § 820.2.) UCLA contended section 856 applied to Rosen's claims because "the heart of [her] case is effectively that the UCLA defendants should have locked up [Thompson] . . . or somehow excluded him from campus." UCLA also argued section 820.2 applied because its employees' treatment decisions regarding Thompson involved personal deliberation and were therefore discretionary in nature.

### b. *Summary of Rosen's arguments in opposition*

In opposition, Rosen argued that several sources of law imposed a duty on UCLA to protect its students from foreseeable criminal conduct. First, Rosen contended that as a "possessor of land," UCLA owed a duty to protect students and other "business invitees" from foreseeable acts of misconduct on its campus. In support, Rosen cited Civil Code section 1714, which provides that "[e]veryone is responsible . . . for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property."

10

Second, Rosen asserted UCLA had a "non-property based dut[y]" to protect her from foreseeable criminal conduct based on her status as a student. Rosen argued that prior cases had recognized universities and colleges are required to supervise students while they are participating in school-sponsored activities. According to Rosen, these supervisory duties necessarily included protecting students from foreseeable third party misconduct occurring within the classroom.

Third, Rosen argued UCLA owed a duty of care under the negligent undertaking doctrine because it had voluntarily elected to "protect the safety of UCLA students." Rosen theorized that by adopting various violence prevention measures and mental health protocols, UCLA had undertaken a duty to follow its procedures, which it had failed to do.

Fourth, Rosen argued there were disputed issues of material fact whether UCLA psychologist Nicole Green had discharged her duties under Civil Code section 43.92, which requires psychotherapists to make reasonable efforts to warn when a patient has communicated an actual threat of physical harm against an identifiable victim. Rosen asserted a trier of fact could reasonably conclude that the "cumulative effect of Thompson's statements" constituted an actual threat of violence against her and every other student that was in Thompson's classes. In support, Rosen cited statements Thompson had made to UCLA personnel describing the anger he felt toward students who were harassing him and his willingness to escalate the matter if UCLA did not discipline the responsible parties.[3]

Rosen also argued there were disputed issues of material fact whether UCLA had breached the duties it owed to its students. In support, Rosen relied on two expert declarations concluding that UCLA had failed to follow its "own policies and procedures and the standard applicable to all universities" regarding student safety. Rosen's experts asserted that UCLA should have conducted a formal threat assessment on Thompson and

---

[3]     Rosen also argued that UCLA owed a duty of care under Government Code section 856. The trial court did not address this argument and Rosen has not referenced the issue in this writ proceeding. We therefore treat the argument as abandoned.

11

forced him to participate in "meaningful psychiatric evaluation and treatment" as a condition of his continued attendance at the school.

Finally, Rosen argued that Government Code sections 820.2 and 856 were inapplicable to her claims because both statutes only immunized a public entity's "'basic policy decisions,'" not the manner in which those policy decisions were implemented. Rosen asserted she was not challenging UCLA's existing policies regarding student safety and the treatment of mentally-ill students, but rather the manner in which UCLA's employees had "implement[ed]" those policies in Thompson's case.

### 3. *The trial court's order denying summary judgment*

The trial court denied the motion for summary judgment, concluding that UCLA "had a duty to warn [Rosen] and/or take reasonable steps to prevent the threat [Thompson] posed to [her]." The court listed three sources of law that imposed a duty on UCLA to protect Rosen from foreseeable third party misconduct. First, the court found that a "special relationship existed" between the parties based on Rosen's "status as a student." Second, the court found Rosen qualified as a "business invitee," explaining that landowners must generally "protect . . . [their] invitee[s] from foreseeable third party criminal acts." Third, the court concluded UCLA "may have voluntarily assumed the duty" to protect Rosen by "overseeing [Thompson's] psychological treatment" and attempting to "accommodate his disability."

The court also found that the parties' conflicting expert declarations raised triable issues of fact whether UCLA had "breached its duty when it failed to inform [Rosen] that Thompson had identified her as a target of his anger and/or failed to place her into a different lab." The court also ruled, without further explanation, that "the immunity statutes do not apply here."

UCLA filed a petition for writ of mandate seeking an order "directing respondent superior court to enter summary judgment" in its favor. We issued an order to show cause.

12

## DISCUSSION

### A. *Standard of Review*

"An order denying a motion for summary judgment may be reviewed by way of a petition for writ of mandamus. (Code Civ. Proc., § 437c, subd. (m)(1); [citation].)" (*Lefiell Manufacturing Company v. Superior Court* (2014) 228 Cal.App.4th 883, 891.) "A writ of mandamus will issue when the denial of a motion for summary judgment results in a trial on a nonactionable claim." (*Ibid*.)

"'A defendant moving for summary judgment has the burden of producing evidence showing that one or more elements of the plaintiff's cause of action cannot be established, or that there is a complete defense to that cause of action. [Citation.]'" (*Hypertouch, Inc. v. ValueClick, Inc*. (2011) 192 Cal.App.4th 805, 817-818.) "'Once the [movant] has met that burden, the burden shifts to the [other party] to show that a triable issue of one or more material facts exists as to that cause of action. . . .' [Citations.] The party opposing summary judgment 'may not rely upon the mere allegations or denials of its pleadings,' but rather 'shall set forth the specific facts showing that a triable issue of material fact exists. . . .' [Citation.] A triable issue of material fact exists where 'the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' [Citation.]" (*Jade Fashion & Co., Inc. v. Harkham Industries, Inc*. (2014) 229 Cal.App.4th 635, 643 (*Jade Fashion*).)

"We review an order granting or denying summary adjudication de novo. [Citation.] In our review, we 'liberally constru[e] the evidence in support of the party opposing summary judgment and resolv[e] doubts concerning the evidence in favor of that party. [Citation.]' [Citation.]" (*City of Pasadena v. Superior Court* (2014) 228 Cal.App.4th 1228, 1233.)

13

### B. *Rosen Failed to Establish a Triable Issue of Material Fact Whether UCLA Had a Legal Duty to Protect her from Third Party Criminal Conduct*

"An action in negligence requires a showing that the defendant owed the plaintiff a legal duty, that the defendant breached the duty, and that the breach was a proximate or legal cause of injuries suffered by the plaintiff. [Citations.]" *(Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673 (*Ann M.*) [disapproved on another ground in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 527, fn. 5].) The issue in this case is whether Rosen established that UCLA, based either on its own legal obligations or those of its employees, had a legal duty to protect its adult students against the criminal acts of third persons.[4] "Duty, being a question of law, is particularly amenable to resolution by summary judgment." (*Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 465.)

"'[A]s a general rule, one owes no duty to control the conduct of another, nor to warn those endangered by such conduct.' [Citation.] A duty to control the conduct of another or to warn persons endangered by such conduct may arise, however, out of what is called a 'special relationship[.]'. . . . Such a duty may arise if "'(a) a special relation

---

[4] Under the Government Claims Act (Gov. Code, §§ 810 et seq.), which "establishes the limits of common law liability for public entities" (*Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 899), a "public entit[y's] potential liability . . . has two sources: (1) the public entit[y's] liability based on [its] own conduct and legal obligations, and (2) the public entit[y's] liability, based on respondeat superior principles, for the misconduct of [its] employees that occurred in the scope of their employment. The . . . Act draws a clear distinction between the liability of a public entity based on its own conduct, and the liability arising from the conduct of a public employee. Although the Act provides that a public employee generally is liable for an injury caused by his or her act or omission 'to the same extent as a private person' (Gov. Code, § 820, subd. (a)) and that, when the act or omission of the public employee occurs in the scope of employment the public entity will be vicariously liable for the injury (Gov. Code, § 815.2), the Act contains no provision similarly providing that a public entity generally is liable for its own conduct or omission to the same extent as a private person or entity. . . . Certain statutes do provide expressly for public entity liability in circumstances that are somewhat parallel to the potential liability of private individuals and entities but, as past cases have explained, '"[t]he intent of the [. . . Act] is not to expand the rights of plaintiffs in suits against governmental entities, but to confine potential governmental liability to rigidly delineated circumstances. . . .'" [Citation.]" (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1128 (*Zelig*) [internal emphases omitted].)

14

exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives the other a right to protection."' [Citations.] "'This rule derives from the common law's distinction between misfeasance and nonfeasance, and its reluctance to impose liability for the latter."' [Citation.]" (*Zelig, supra,* 27 Cal.4th at p. 1129.)

In her response to our order to show cause, Rosen presents six theories why UCLA owed a legal duty to protect her from Thompson's allegedly foreseeable misconduct: (1) Rosen's status as a matriculated student established a special relationship with UCLA giving rise to a duty to protect; (2) as a property owner, UCLA owed a duty to protect its "business invitees" from foreseeable criminal activity that might occur on its campus; (3) under the "negligent undertaking" doctrine, UCLA's decision to adopt violence prevention protocols and provide student mental health counseling gave rise to a duty to protect; (4) Civil Code section 42.93 imposed a statutory duty on UCLA psychologist Nicole Green to warn Rosen that Thompson had made a serious threat of physical harm against her; (5) by paying tuition fees, Rosen entered into a contractual relationship with UCLA that created a duty to protect; and (6) UCLA had a duty to protect its students from campus violence based on labor statutes that require employers to provide a safe workplace.

### 1. *UCLA did not owe a legal duty to protect Rosen from third party criminal conduct based on her status as a student*

Rosen first contends that her status as a matriculated student created a special relationship with UCLA that required the school and its employees to protect her from foreseeable third party criminal conduct that might occur within the classroom. Our Supreme Court has recognized such a duty in the context of elementary and secondary schools: "'[A] school district and its employees have a special relationship with the district's pupils . . . arising from the mandatory character of school attendance and the comprehensive control over students exercised by school personnel, 'analogous in many

15

ways to the relationship between parents and their children.' [Citations.] Because of this special relationship, . . . school personnel [have a] . . . duty to use reasonable measures to protect students from foreseeable injury at the hands of third parties acting negligently or intentionally. This principle has been applied in cases of employees' alleged negligence resulting in injury to a student by another student. [Citations]." (*C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 870-871 [fn. omitted].) Our courts have consistently held, however, that an adult student's affiliation with a college or university does not give rise to a similar duty.

For example, in *Crow v. State of California* (1990) 222 Cal.App.3d 192 (*Crow*), a student filed a negligence claim against a state university after being assaulted by another student inside a school dormitory. The plaintiff's complaint alleged that the school "knew of the vicious and dangerous propensities of [the attacker]," who had previously assaulted a residence hall advisor. (*Id.* at p. 197.) The complaint further alleged that, despite such knowledge, the university had "refused and neglected to take any action to prevent [the assailant] from continuing in his vicious and dangerous propensities and to prevent the attack, assault and battery on plaintiff." (*Ibid.*) The defendants moved for summary judgment, arguing that they had "no duty to control the acts of adult students." (*Id.* at p. 198.) The plaintiff, however, "contended . . . that his affiliation with the university as a student created . . . a special relationship" giving rise to "an affirmative duty to protect him" from the foreseeable "criminal acts of a third party." (*Id.* at p. 209.) In support, plaintiff cited prior case law holding that secondary schools "ha[ve] a duty to protect student[s]" from foreseeable attacks by third parties. (*Ibid.*)

The appellate court concluded that the university had no duty to protect the plaintiff, explaining that there is a "distinction between young, immature schoolchildren in grammar and high schools on the one hand and adult students in colleges and universities on the other." (*Crow, supra*, 222 Cal.App.3d at p. 209.) Unlike high school students, who are required to attend class and remain under the "direct[] charge" of school officials (*id.* at 208), adult college students attend voluntarily and "regulate their own lives." (*Id.* at p. 209.) The appellate court reasoned that imposing a duty on college

16

and universities to protect their students from third party criminal conduct would require a level of supervision and regulation that was incompatible with the "realities of modern college life" and the "goal[s] of postsecondary education." (*Ibid*.)

Subsequent decisions have adopted *Crow's* reasoning, concluding that a student's attendance at a university is not, standing alone, sufficient to create a special relationship giving rise to a duty to protect. In *Tanja H. v. Regents of the University of California* (1991) 228 Cal.App.3d 434 (*Tanja H.*), a student filed tort claims against the Regents of the University of California and its officials after being sexually assaulted by fellow students during a party where alcohol had been served. Citing *Crow*, the appellate court agreed with defendants' assertion that "'the relationship between the [university] and [its students] did not create a special relationship imposing a duty of care to prevent . . . injuries [caused by other students].' [Citation.]" (*Id*. at p. 437.) The court explained that "[a]s campuses have . . . moved away from their former role as semimonastic environments subject to intensive regulation of student lives by college authorities, they have become microcosms of society; and unfortunately, sexually degrading conduct or violence in general – and violence against women in particular – are all too common within society at large. College administrators have a moral duty to help educate students in this respect, but they do not have a legal duty to respond in damages for student crimes." (*Ibid*.) As in *Crow*, the court also noted that "mak[ing] colleges liable for damages caused by third parties" would effectively require universities to "impose onerous conditions on the freedom and privacy of resident students . . . [which] are incompatible with a recognition that [adult] students are now generally responsible for their own actions and welfare. . . . In these circumstances, the courts can establish the criminal and civil liability of the perpetrators of crimes; but the courts with good reason have been unwilling to shift moral and legal responsibility away from student perpetrators and onto the heads of college administrators." (*Id.* at pp. 438-439.)

Finally, in *Ochoa v. California State University* (1999) 72 Cal.App.4th 1300 (*Ochoa*) [disapproved of on other grounds in *Avila v. Citrus Community College Dist.* (2006) 38 Cal.4th 148, 160, fn. 5 (*Avila*)], a student filed a negligence claim against his

17

university after being struck by an opposing player during an intramural soccer game. The appellate court concluded that plaintiff's status as a student "did not create a special relationship imposing a duty of care on [the university]. Unlike high school students, whose attendance is compelled and over whom school officials have direct responsibility while the students are at school, adult college students attend school and participate in school activities voluntarily. [Citation.] Furthermore, since college administrators have abandoned in *loco parentis* supervision of adult students and have recognized the students' rights to control and regulate their own lives, colleges and universities may no longer be charged with a general duty of care to supervise student activities." (*Ochoa, supra,* 72 Cal.App.4th at p. 1306.) Other cases are in accord. (See *Stockinger v. Feather River Community College* (2003) 111 Cal.App.4th 1014, 1029 ["case law recognizes that the presumed maturity of college students warrants different treatment in terms of duty of supervision"]; *Baldwin v. Zoradi* (1981) 123 Cal.App.3d 275, 287-291.)

We find no basis to depart from the settled "rule that institutions of higher education have no duty to their adult students to protect them against the criminal acts of third persons." (*Ochoa, supra*, 72 Cal.App.4th at p. 1306.) As with the sexual assault that occurred in *Tanja H.*, *supra*, 228 Cal.App.3d 434, the conduct at issue here—a violent crime perpetrated by an individual suffering from mental illness—is a societal problem not limited to the college setting. While colleges and universities may properly adopt policies and provide student services that reduce the likelihood such incidents will occur on their campuses, they are not liable for the criminal wrongdoing of mentally-ill third parties, regardless of whether such conduct might be in some sense foreseeable.[5]

---

**5** The consequences of imposing such a duty on institutions of higher learning are difficult to predict. Some schools might attempt to shield themselves from liability by reducing or eliminating mental health services, thereby increasing the overall risks to the student community. Other schools might chose to compel their students, particularly those with mental disabilities, to participate in a wider range of mental health services, thereby intruding on the privacy and freedoms associated with the modern college experience. A college or university's task in addressing these issues would be further complicated by various statutes that prohibit discrimination based on disabilities, including mental illness. (See, e.g., 42 U.S.C. § 12182(a); 29 U.S.C. § 794.)

18

Despite the holdings in *Crow*, *Tanja H*., and *Ochoa*, Rosen contends that at least two other decisions—*Avila, supra,* 38 Cal.4th 148 and *Patterson v. Sacramento City Unified School Dist*. (2007) 155 Cal.App.4th 821 (*Patterson*)—have recognized that colleges and universities owe a "duty to supervise their adult students." Rosen argues that the supervisory duties described in these cases necessarily extend to protecting students in the classroom. *Avila* and *Patterson*, however, addressed substantially different circumstances. Moreover, both decisions included language acknowledging that colleges and universities generally owe no duty of care to protect students from third party misconduct.

In *Avila, supra,* 38 Cal.4th 148, the plaintiff was struck in the head with a pitch during an intercollegiate baseball game. Plaintiff alleged that the pitcher, who played for the home team, had intentionally thrown the ball toward his head. Plaintiff filed a negligence complaint alleging that the host school had failed to provide visiting opponents with proper medical care and failed to supervise and control its student-athlete. The college demurred, contending it had no duty of care to protect the plaintiff from the perpetrator's intentional, wrongful conduct.

In its analysis, the Supreme Court explained that prior decisions had established elementary and secondary schools "have a duty to supervise students [citations], a duty that extends to athletic practice and play. [Citation.]" (*Avila, supra,* 38 Cal.4th at p. 158.) Citing *Crow*, the Court noted that "colleges and universities do not owe similarly broad duties of supervision to all their students [citations]," (*id*. at p. 158), but explained that a "separate body of law ha[d] developed" (*id*. at p. 159) recognizing that "colleges and universities owe special duties to their athletes when conducting athletic practices and games." (*Id*. at p. 158.) The Court found it reasonable to extend this duty to visiting athletes, concluding that the "benefits" a host school derives from "intercollegiate competition" (including economic benefits) justified imposing a "duty to home and visiting players alike to . . . not increase the risks inherent in the sport." (*Id*. at p. 162.) The Court clarified it had "no quarrel" with prior cases holding that colleges "owe no general duty to their students to ensure their welfare," reiterating that "[t]he duty

19

of a host school to its own and visiting players in school-supervised athletic events is an exception to the general absence of duty." (*Id.* at pp. 162-163.)

There is no language in *Avila* supporting Rosen's contention that colleges and universities owe a "supervisory" duty to protect students from third party misconduct that occurs within the classroom. *Avila* repeatedly explained that the supervisory duties at issue in that case related to athletes participating in intercollegiate athletics, which the Court specifically described as an "exception" to the general rule that colleges and universities have no duty to protect their students. (*Avila, supra,* 38 Cal.4th at p. 162.) Moreover, the Court repeatedly cited with approval *Crow* and other cases holding that the relationship between a college and its students does not give rise to a duty to protect from wrongful third party conduct.

*Patterson, supra,* 155 Cal.App.4th 821, has even less relevance to the issues presented in this case. The plaintiff in *Patterson* was a student in an adult truck driver training course. As part of the course curriculum, the students were required to load bleachers onto a flat bed truck. An instructor supervised the students while they loaded a set of lightweight, aluminum bleachers onto the truck. The instructor then sent the students to another location to load a second set of heavier wooden bleachers without supervision. While loading the wooden bleachers, the plaintiff fell off the flat bed truck and was injured. The plaintiff filed a negligence claim alleging the school district had breached its duty to properly supervise the students during their class-related activities.

In assessing whether the school owed a duty to supervise, the court observed that *Crow*, *Ochoa* and other cases had "specifically found" that a "plaintiff's affiliation with the university as a student" did not create a special relationship giving rise to a duty to protect from third party criminal conduct. (*Patterson, supra*, 155 Cal.App.4th at p. 831.) The court concluded, however, that those decisions did "not hold that school or community college districts never owe a duty of care to their adult students." (*Id*. at p. 832.) The court found that, under the circumstances, the school did owe a duty to supervise its students because the activity that resulted in plaintiff's injuries was part of the course curriculum and had been undertaken at the direction of the class instructor.

20

(*Ibid.*)  While *Patterson* suggests colleges and universities owe a duty to ensure their adult students do not injure themselves while performing class-related tasks, the case has no relevance to the question presented here:  whether an adult student shares a special relationship with his or her school that gives rise to a duty to protect from third party misconduct.[6]

### 2.  *UCLA did not owe a duty to protect Rosen based on her status as an invitee onto the property*

Rosen next contends that UCLA owed a duty to protect her from foreseeable criminal conduct based on her status as a "business invitee" onto campus property.  (See *Donnell v. California Western School of Law* (1988) 200 Cal.App.3d 715, 719 (*Donnell*) ["Mature students are generally considered business invitees"]; see also *Stockwell v. Board of Trustees* (1944) 64 Cal.App.2d 197, 203 (*Stockwell*) [treating adult student as "a person invited upon the premises"].)  As set forth in her trial court brief, Rosen argues that Civil Code section 1714 imposes a duty on every landowner to "take affirmative action to control the wrongful acts of third persons which threaten invitees where the occupant has reasonable cause to anticipate such acts and the probability of injury resulting therefrom."  (*Taylor v. Centennial Bowl, Inc.* (1966) 65 Cal.2d 114, 121; see also *Ann M., supra,* 6 Cal.4th at p. 674; *Kentucky Fried Chicken of Cal., Inc. v. Superior*

---

[6]      Rosen also argues that public colleges and universities have a duty to protect students from foreseeable criminal conduct based on Section 28, subdivisions (a)(7) and (f)(1) of Article 1 of the California Constitution, which declare, respectively:  "[T]he right to public safety extends to public and private . . . college and university campuses, where students and staff have the right to be safe and secure in their persons"; "All students and staff of public [schools] . . . have the inalienable right to attend campuses which are safe secure and peaceful."  Prior decisions have rejected this argument, concluding that the constitutional provisions on which Rosen relies do not "impose an express affirmative duty on any [public] agency to guarantee the safety of schools." (*Clausing v. San Francisco Unified School Dist.* (1990) 221 Cal.App.3d 1224, 1238-1239; *Bautista v. State of California* (2011) 201 Cal.App.4th 716, 729 ["the right to safe schools [set forth in the California Constitution] . . . require[s] legislative action to make the constitutional provision operative as a judicially enforceable right"]; *Leger v. Stockton Unified School Dist.* (1988) 202 Cal.App.3d 1448, 1455.)  We agree with the reasoning of those decisions.

*Court* (1997) 14 Cal.4th 814, 823-824 (*Kentucky Fried Chicken*) ["[a] land occupier 'must act as a reasonable person to avoid harm from the negligence of . . . persons who have entered [onto the land], and even from intentional attacks on the part of such third persons.  He is required to take action when he has reason to believe, from what he has observed or from past experience, that the conduct of the other will be dangerous to the invitee, but not if there is no reason to anticipate a problem.'  [Citation.]"].)

In *Zelig, supra*, 27 Cal.4th 1112, our Supreme Court clarified that the general rule requiring private landowners to protect invitees from foreseeable third party misconduct does not apply to public entity landowners.  (*Id.* at p. 1132.)  The plaintiffs in *Zelig* filed a negligence claim against the County of Los Angeles after their mother was shot and killed by her ex-husband at a courthouse while awaiting a hearing in a dissolution proceeding.  Plaintiffs alleged their mother had repeatedly informed court personnel that her ex-husband had threatened her life and that she believed he would attempt to kill her in the courthouse.  Plaintiffs argued that Civil Code section 1714 imposed a duty on the County to protect invitees into the courthouse from foreseeable criminal conduct, theorizing that "like a private property owner," a public entity "bear[s] some legal responsibility for preventing criminal conduct on its premises."  (*Id.* at p. 1131.)

The County demurred, arguing that Government Code section 835 limited their premises liability to injuries caused by physical defects on the property.  The trial court sustained the demurrer without leave to amend.  The appellate court reversed, but was itself reversed by the Supreme Court, which concluded that Government Code section 835, rather than Civil Code section 1714, controls "the liability of public entities as property owners."  (*Zelig, supra*, 27 Cal.4th at p. 1132.)

The Court explained that under section 835, a public entity may only be held liable for injuries that arise from a "'dangerous condition'" (*Zelig, supra*, 27 Cal.4th at p. 1134), which refers to a physical "defect in the property itself."  (*Id.* at p. 1135.)  The Court further explained that "'third party conduct by itself, unrelated to the condition of the property, does not constitute a "dangerous condition" for which a public entity may be held liable.'  [Citation.]"  (*Id.* at p. 1134.)  Although a public entity "may be held

22

liable if it 'maintained the property in such a way so as to increase the risk of criminal activity' or in such a way as to 'create[] a reasonably foreseeable risk of . . . criminal conduct'" (*id.* at pp. 1134-1135), liability will not attach unless "the defect in the physical condition of the property [has] some causal relationship to the third party conduct that actually injures the plaintiff." (*Id.* at p. 1135.)

The Court specifically rejected the appellate court's conclusion that "the liability of the public entities could be based on the general negligence principles of Civil Code section 1714, which apply to and govern the potential liability of private property owners." (*Zelig, supra*, 27 Cal.4th at p. 1132.) According to the Court, "[i]n structuring Government Code section 835 . . ., the Legislature took into account the special policy considerations affecting public entities in their development and control of public property and made a variety of policy judgments as to when a public entity should or should not be liable in monetary damages for injuries that may occur on public property. These policy judgments would be undermined if an injured person could ignore the limitations embodied in Government Code section 835 and invoke the very general provisions of section 1714 of the Civil Code to impose liability on a public entity in circumstances in which such liability would not be permitted under section 835. [I]n determining [a] public entit[y's] [premises] . . . liability, [courts] must evaluate [the] plaintiff['s] claim under the provisions of Government Code section 835 alone." (*Ibid.*)

Under *Zelig*, a public college or university may not be held liable as a property owner for injuries caused by third party criminal conduct that is unrelated to any physical condition on the property. Rosen concedes that she does not allege any physical condition on the property contributed to Thompson's actions or to her injuries. Instead, Rosen is asserting only that UCLA had a duty to protect her from foreseeable criminal conduct based solely on its status as the "possessor of land" on which the crime occurred. Government Code section 835 precludes that claim.[7]

---

[7] The duty the dissent would impose on UCLA through expansion of the "special relationship" doctrine appears substantially similar to the duty that private

23

### 3. *Rosen failed to establish a triable issue of material fact whether UCLA owed a duty of care under the negligent undertaking doctrine*

Rosen next argues that the trial court properly concluded there are disputed issues of material fact whether UCLA owed a duty to protect her from Thompson's criminal acts under the "negligent undertaking doctrine," which has been characterized as an "exception to the no-duty-to-protect rule." (*Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 235, fn. 13 (*Delgado*).) As "reflected in Restatement Second of Torts, section[] 323" (*id.* at p. 249, fn. 28), the doctrine provides that "a volunteer who, having no initial duty to do so, undertakes to provide protective services to another, will be found to have a duty to exercise due care in the performance of that undertaking if one of

landowners currently owe to their business invitees. (Compare Dis. opn. post, at p. 2 ["I would find . . . a special relationship exists between a college and its enrolled students . . . and the school has a duty to take reasonable steps to keep their classrooms safe from foreseeable threats of violence"] with *Peterson v. San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 807 [private landowner may be held liable "for physical harm caused by the . . . intentionally harmful acts of third persons . . . and by the failure of the [landowner] to exercise reasonable care to (a) discover that such acts are being done or are likely to be done, or (b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it.' [Citations.]"]; *Kentucky Fried Chicken, supra*, 14 Cal.4th at p. 823-824 [landowner "required to take action when he [or she] has reason to believe, from what he [or she] has observed or from past experience, that the conduct of the other will be dangerous to the invitee, but not if there is no reason to anticipate a problem.' [Citation.]"].) Through enactment of section 835, however, the Legislature has limited the circumstances under which a public entity landowner may be held liable for physical injuries a third party inflicts on its business invitees. Given the limitations set forth in section 835, we think it would be improper to impose a duty on public entities to protect a particular type of invitee—college students (see *Donnell, supra,* 200 Cal.App.3d at p. 719 ["Mature students are generally considered business invitees"]; *Stockwell, supra,* 64 Cal.App.2d at p. 203 [treating adult student as "a person invited upon the premises"])—through expansion of the special relationship doctrine. (See *Zelig, supra*, 27 Cal.4th at p. 1132 ["[i]n structuring . . . section 835 . . ., the Legislature took into account the special policy considerations affecting public entities in their . . . control of public property and made a variety of policy judgments as to when a public entity should or should not be liable in monetary damages for injuries that may occur on public property. These policy judgments would be undermined if an injured person could . . . impose liability on a public entity in circumstances in which such liability would not be permitted under section 835"].) If liability is to be expanded in such a manner, it is a matter for the Legislature.

24

two conditions is met: either (a) the volunteer's failure to exercise such care increases the risk of harm to the other person, or (b) the other person reasonably relies upon the volunteer's undertaking and suffers injury as a result." (*Id*. at p. 249.) Rosen asserts the doctrine applies here because the evidence shows UCLA adopted various protocols and policies that were intended to address "campus threats of violence . . ., particularly those driven by mental health issues." In support, she cites materials describing UCLA's violence prevention policies and its overall commitment to campus safety.

Even assuming Rosen could establish that UCLA did undertake to protect its students from potentially violent students and that it performed this task in a negligent manner, Rosen's claim fails. To prevail under the negligent undertaking doctrine, Rosen must additionally prove one of the following conditions: (1) that UCLA's actions increased her risk of physical harm, or (2) that she relied on UCLA's undertaking and suffered injury as a result. (See *Paz v. State of California* (2000) 22 Cal.4th 550, 560 (*Paz*) ["the negligent undertaking theory of liability requires more than simply establishing defendants' undertaking to another. . . . [L]iability depends on [proving one of the additional conditions set forth in the Restatement]"]; *Delgado, supra,* 36 Cal.4th at p. 248 [defendant who undertakes to provide protective services to another has a duty "if one of [the] two [additional] conditions is met"].) Rosen has produced no evidence that she can prove either condition.

Rosen argues that UCLA "increased her risk of harm" by failing to follow its own safety and violence prevention procedures (or by failing to adopt appropriate procedures), thereby exposing her to Thompson's violent conduct. The "increased risk" element of the negligent undertaking doctrine, however, is not satisfied where the defendant merely "fail[ed] to eliminate a preexisting risk." (*City of Santee v. County of San Diego* (1989) 211 Cal.App.3d 1006, 1015-1016 (*Santee*).) For example, in *Paz*, *supra*, 22 Cal.4th 550, the plaintiff alleged the defendant had voluntarily undertaken to install a traffic light at a dangerous intersection and then breached its duty of care by failing to install the light in a timely manner. The Supreme Court concluded that evidence showing defendants had delayed in installing the light was not sufficient to prove an increase in plaintiffs' risk of

harm: "The evidence fails to support an inference that defendants' conduct increased the risk of physical harm to plaintiff beyond that which allegedly existed at the intersection. Plaintiff alleged that the intersection was dangerous because of restricted sight lines. However, nothing in the record suggests that defendants did anything that increased the risk to motorists that allegedly existed because of these sight lines. Instead, defendants simply did not succeed in completing - - before plaintiff's collision - - a project that might have reduced the preexisting hazard at the intersection. . . . [A] failure to alleviate a risk cannot be regarded as tantamount to increasing that risk." (*Id*. at p. 560.)

Similarly, in *Santee, supra,* 211 Cal.App.3d 1006, the plaintiff alleged that defendant had voluntarily undertaken a duty to report street light outages and then negligently performed its duty by failing to report an outage that resulted in the plaintiff's injury. The court concluded the plaintiff had failed to satisfy the "increased risk" element, explaining that "the failure to report the light outage did not increase the risk posed by an inoperative light; instead, the risk posed by the inoperative light remained unaltered. The failure to report the outage only failed to decrease the risk. . . . [¶] Nonfeasance which results in failure to eliminate a preexisting risk is not equivalent to nonfeasance which increases a risk of harm." (*Id*. at pp. 1015-1016.)

As in *Paz* and *Santee*, Rosen has provided no evidence that UCLA's actions increased the risk of harm that Thompson posed to her beyond that which existed before the school had taken any action to address his mental condition. Instead, she contends only that UCLA failed to alleviate the "preexisting risk" Thompson posed to her and other students. (*Santee, supra,* 211 Cal.App.3d at p. 1016.) She does not allege, for example, that UCLA's actions exacerbated Thompson's condition, thereby making him more dangerous to the community than he would have been in the absence of any such action. For the purposes of the negligent undertaking doctrine, UCLA's alleged failure to neutralize the risk that Thompson posed to her is not sufficient to demonstrate an "increased risk of harm."

Rosen has also failed to provide any evidence that she was harmed because she detrimentally relied on UCLA's student safety measures. (See *Paz, supra,* 122 Cal.4th at

26

p. 561 [to prove reliance, plaintiff was required to provide "evidence that [she] was harmed because . . . [she] . . . relied on" defendant's alleged undertaking].)  The only argument Rosen presented in the trial court regarding the question of reliance appeared in a single sentence of her opposition brief stating:  "Rosen, like all UCLA students, was encouraged to rely on [the school's student safety measures] in attending the university."  Although Rosen did not cite any evidence in support of this statement, other portions of her opposition referenced marketing materials in which UCLA explained the priority it places on student safety and the importance of mental health counseling in violence prevention.  Rosen cites no evidence that she personally relied on such assurances or that her reliance resulted in her injuries.  (*Jade Fashion, supra,* 229 Cal.App.4th at p. 643 [party opposing summary judgment must set "forth the specific facts showing that a triable issue of material fact exists" and "'may not rely upon the mere allegations or denials of its pleadings'"].)  Indeed, Rosen has failed to cite any evidence that she was even aware of such policies at any time prior to Thompson's attack.

> ### 4. *Rosen failed to produce evidence establishing the existence of a triable issue of material fact whether Nicole Green had a duty to warn under Civil Code section 43.92*

Rosen also argues there is a disputed issue of material fact whether Nicole Green, a UCLA psychologist who provided treatment to Thompson, had a statutory duty to warn under Civil Code section 43.92.  Subdivision (a) of the statute states:  "There shall be no monetary liability on the part of, and no cause of action shall arise against, any . . . psychotherapist . . . in failing to warn of and protect from a patient's threatened violent behavior . . . . except where the patient has communicated to the psychotherapist a serious threat of physical violence against a reasonably identifiable victim or victims."  Thus, under section 43.92, a psychotherapist may be held liable "'"for failure to warn [only] . . . where the patient has communicated an 'actual threat of violence against an identified victim[.]'"'" [Citation.]"  (*Calderon v. Glick* (2005) 131 Cal.App.4th 224, 231

27

(*Calderon*).)[8]  The parties do not dispute that Green qualifies as a psychotherapist within the meaning of section 43.92 and that, if she failed to discharge her statutory duties, UCLA could be held liable for such conduct under principles of respondeat superior. (See Gov. Code, §§ 815.2; 820, subd. (a).)

To establish a triable issue of material fact whether Green violated her duties under section 43.92, Rosen was required to produce evidence that would "allow a reasonable trier of fact to find that [Thompson] had 'communicated' to [Green] 'a serious threat of physical violence' against [Rosen]." (*Calderon, supra*, 131 Cal.App.4th at p. 232.)  The record contains no such evidence.  Rather, the record indicates that during his sessions with Green, Thompson consistently told her he did not intend to harm anyone and never made any reference to Rosen.  At Thompson's initial intake interview, held March 11, 2009, Thompson told Green he had never considered, and was not currently considering, harming another person.  He also denied having any intent to harm the individuals he believed were harassing him.  At a follow-up meeting the next day, Thompson stated he did not have any intent to harm others and denied experiencing any homicidal ideation.[9]  During subsequent meetings with Green on March 18th, 26th and

---

[8]  The Legislature passed Civil Code section 43.92 in response to *Hedlund v. Superior Court* (1983) 34 Cal.3d 695 and *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, which contained broad language suggesting that a therapist owed a duty of care "'to predict and warn of potential violence by his patient'" (*Ewing v. Goldstein* (2004) 120 Cal.App.4th 807, 816 (*Ewing*).)  ""Section 43.92 strikes a reasonable balance in that it does not compel the therapist to predict the dangerousness of a patient.  Instead, it requires the therapist to attempt to protect a victim under limited circumstances, even though the therapist's disclosure of a patient confidence will potentially disrupt or destroy the patient's trust in the therapist." (*Id.* p. 817.)

[9]  Notes from the March 12th meeting indicate that Thompson provided Green a copy of a three-page letter he had written to Associate Dean Naples in January of 2009, which describes a series of "events of ridicule/persecution" that Thompson had allegedly been subjected to while living in his dormitory.  Toward the end of the letter, Thompson asked Naples to issue "letters of admonition" to the responsible parties (who were not identified), explaining that the situation might otherwise "escalate" into something "more serious" and that Thompson might "end up acting in a manner that will incur undesirable consequences upon [himself]."  None of these statements constitute an actual threat of

28

April 10th, Thompson again denied suicidal or homicidal ideation and did not communicate any threat of harm. At their final meeting on April 17th, Thompson informed Green that he still got angry when he heard insults or harassment, but did not intend to harm anyone.

Although Rosen has cited no evidence that Thompson communicated a threat of physical violence against her to Green, she argues that the "cumulative effect" of all the statements Thompson made to UCLA personnel, and the "totality of the information available" to the school, would support a jury finding that he did make an actual threat of violence and that Rosen was identifiable as one of his potential victims. In support, Rosen cites to statements that Thompson allegedly made to Naples (the Dean of Students), McDaniel (a UCLA psychiatrist) and Goetz (a chemistry teaching assistant). Even if we assume Thompson's statements to these individuals could be reasonably construed as actual threats of physical violence and that Rosen was identifiable as a potential victim of such threats, Rosen has provided no evidence that Nicole Green had any knowledge of those statements. Although a psychotherapist's duties under section 43.92 may be triggered by information provided by persons other than the patient (see *Ewing, supra*, 120 Cal.App.4th at p. 821 [information communicated to psychotherapist by patient's immediate family members may give rise to duty to warn]), the statute makes clear that the threat must have been "actually communicated to [the] therapist." (*Id.* at p. 816, fn. 9.) Statements that Thompson allegedly made to other UCLA personnel are, standing alone, insufficient to raise a triable issue of fact whether Green owed a duty to warn under section 42.93.[10]

---

serious physical harm against Rosen. Moreover, during the meeting at which Thompson presented the letter, he specifically informed Green he did not have any intent to harm others.

[10] In her response to our order to show cause, Rosen argues that she was not required to produce evidence demonstrating that Thompson communicated a threat of harm to Green because UCLA failed to make an initial showing that Rosen "does not possess, and cannot reasonably expect to obtain" evidence that Thompson communicated such a threat

##### *5. Rosen failed to establish the existence of a triable issue of fact regarding either of her newly-raised theories of liability*

In her response to our order to show cause, Rosen argues for the first time that "two additional bases exist to support the trial court's ruling that UCLA owed [her a duty to protect]." First, Rosen contends that "'[b]y the act of matriculation, together with the payment of required fees,'" she entered into an "implied-in-fact" contract with UCLA that created "a special relationship of the type that gave rise to a duty [to protect]" her from foreseeable criminal conduct. Second, Rosen argues UCLA had a duty to protect her based on labor statutes that require employers to address threats of violence in the workplace. (See generally *Franklin v. Monadnock Co*. (2007) 151 Cal.App.4th 252, 260 ["Labor Code section 6400 et seq. and Code of Civil Procedure section 527.8 . . . require employers to provide a safe and secure workplace, including a requirement that an employer take reasonable steps to address credible threats of violence in the workplace"].)

---

to Green. (*Kahn v. East Side Union High School Dist*. (2003) 31 Cal.4th 990, 1003 [setting forth evidentiary framework applicable to motions for summary judgment]). Rosen argues that because UCLA never made such a showing, the burden never shifted to her to "show[] the existence of a triable material factual issue." (*Intrieri v. Superior Court* (2004) 117 Cal.App.4th 72, 82 ["If the defendant fails to make this initial showing, it is unnecessary to examine the plaintiff's opposing evidence and the motion must be denied"].)

We reject Rosen's contention that UCLA had an initial burden to produce evidence demonstrating that she could not prevail on a claim under Civil Code section 43.92. For purposes of summary judgment, a moving defendant must carry its burden as to all theories of liability reflected in the pleadings. (*Lopez v. Superior Court* (1996) 45 Cal.App.4th 705, 714.) Rosen's complaint does not include any reference to Nicole Green or to Civil Code section 43.92. The complaint merely alleges UCLA and its personnel had a "special relationship" with Rosen because they had "invited [her] onto the campus property and . . . enrolled her as a student in exchange for the payment of tuition." Rosen first raised the issue of section 43.92 in response to UCLA's motion for summary judgment, asserting that even if she did not share a special relationship with UCLA giving rise to a duty to protect, there was a triable issue of fact whether Green (and therefore UCLA) were nonetheless liable under section 43.92.

30

Rosen did not raise either of these legal theories in her complaint or in her opposition to UCLA's motion for summary judgment. Under the "principles of 'theory of trial'" (*North Coast Business Park v. Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 29), the failure to raise a legal theory in the trial court proceedings ordinarily constitutes a forfeiture of the issue on appeal: "'[A] party is not permitted to change his position and adopt a new and different theory on appeal. To permit him to do so would . . . be . . . manifestly unjust to the opposing party. The[s]e principles . . . apply to motions [citation], including summary judgment motions. [Citation.]" (*Ibid.*; see also *Ernst v. Searle* (1933) 218 Cal. 233, 240-241; *Webster v. Southern Cal. First Nat. Bank* (1977) 68 Cal.App.3d 407, 416-417 ["A party may not present his case at the trial court on one theory and then urge a completely different theory on appeal"].) Rosen's trial court opposition identified and analyzed five distinct legal theories that allegedly established UCLA's duty to protect. None of those theories referenced Rosen's contractual relationship with the university or statutes governing workplace safety.[11] Rosen has presented no argument explaining why her failure to raise these theories in the trial court does not constitute a forfeiture.

Even if Rosen had presented these theories below, they both fail on their merits. Rosen's first theory – that UCLA owed her a duty to protect based on an implied-in-fact contract between them – relies on two lines of cases. The first set of cases holds that "a

---

[11]    In her response, Rosen contends her opposition did argue that UCLA owed a duty to protect her based on employee workplace safety statutes. In support of this assertion, she cites language in the "Statement of Facts" section of her trial court opposition stating: "For decades, both federal and state OSHA laws and guidelines . . . required employers to provide safe workplaces for their employees and to have programs in place to prevent incidents of violence. UCLA is not only a university, but it is also the fifth large employer in Los Angeles County. As such, UCLA was required to provide a safe workplace." This isolated statement was insufficient to raise the argument Rosen now asserts: that she was personally entitled to the statutory protections set forth in employee safety laws. The language does not suggest she was personally entitled to such protections; it merely summarizes laws regulating UCLA's relationship with its employees. Moreover, the language is set forth in the "Statement of Facts" portion of Rosen's opposition. The "Argument" section of her opposition contains no reference to the employee protection statutes or her status as an alleged employee.

special relationship of the type that gives rise to a duty to take affirmative action to protect another may be created by contract." (*Suarez v. Pacific Northstar Mechanical, Inc.* (2009) 180 Cal.App.4th 430, 438.) Thus, for example, a company that contracts to provide security services has an affirmative duty to protect the individuals it was hired to protect. (See *Marois v. Royal Investigation & Patrol, Inc.* (1984) 162 Cal.App.3d 193, 199-200.) The second line of cases holds that ""'[b]y the act of matriculation, together with the payment of required fees, a[n implied] contract between [a] student and the institution is created . . . .""'" (*Kashmiri v. Regents of University of California* (2007) 156 Cal.App.4th 809, 824 (*Kashmiri*).) Rosen contends that applying those two principles here, she entered into an implied-in-fact contract with UCLA that required the university to protect her from foreseeable criminal conduct. UCLA does not dispute it shared a contractual relationship with Rosen, but argues she has produced no evidence that their implied contract included any term that gave rise to a duty to protect. We agree.

Rosen presents two theories why the terms of her implied contract with the university includes a duty to protect. First, she asserts that "UCLA students, and Rosen in particular, had expectations arising out of the payment of tuition and fees that they would be protected from and warned of foreseeable threat of campus violence. [¶] . . . [¶] In other words, with enrollment, a special relationship arises between universities and their students [giving rise to a duty to protect]." Although a contract may give rise to a duty to protect, the duty must arise from an actual term within the contract. (See generally *Suarez, supra,* 180 Cal.App.4th at p. 439 [looking at the terms of the parties' agreement to determine whether defendant had a contractual duty to protect].) The mere fact Rosen may have "expect[ed]" the university would protect her from campus violence is insufficient to show that the terms of the implied contract actually required the school to do so. (See generally *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 956 ["[t]he parties' undisclosed intent or understanding is irrelevant to contract interpretation"].) If accepted, this argument would effectively impose a duty on every college and university to protect their students against third party misconduct. As explained above, our courts have

32

rejected such a rule. (*Ochoa, supra,* 72 Cal.App.4th at p. 1306 ["institutions of higher education have no duty to their . . . students to protect them against the criminal acts of third persons"].)

Rosen alternatively argues that the terms of their implied contract included a duty to protect based on statements UCLA made in a university publication. In support, Rosen cites language from a brochure entitled "Preventing and Responding to Violence in the UCLA Community" stating that the school is "committed to providing a safe work environment for all faculty, staff and students – one that is free from violence or threats of harm." Although a statement in a school publication may create an enforceable "term" of the implied agreement between the student and the institution, "not all statements in these publications amount to contractual obligations." (*Kashmiri, supra,* 156 Cal.App.4th at p. 829.) Whether a statement qualifies as a term of the implied contract "is measured by the definiteness, specificity, or explicit nature of the representation at issue." (*Id*. at 832.) To create a contractual obligation, the statement must "specifically promise[]" that the school will provide a specified service or otherwise follow a specified course of action. (See *id*. at p. 826 ["Courts have . . . appl[ied] contract law when the educational institution makes a specific promise to provide an educational service"].) "General and vague declarations or promises in university publications [do not] create[] contractual obligations," nor do statements that "merely . . . declar[e] [a university's] general approach to the subject matter discussed." (*Sanchez v. The New Mexican* (1987) 106 N.M. 76, 79, 738 P.2d 1321, 1324; see also *Kashmiri, supra*, 156 Cal.App.4th at p. 832, 825 fn. 9 [citing and following *Sanchez*].) UCLA's statement that it is "committed to providing a safe work environment for all faculty, staff and students" is not a "specific promise" that the university would undertake a legal duty to protect its students from third party misconduct. Rather, the statement is in the nature of a general declaration expressing the importance the university places on the issue of campus

safety.[12]  (See *Kashmiri, supra*, 156 Cal.App.4th at p. 833 [university statements not enforceable if they "merely [relate] an expectation"].)

Rosen has also failed to establish there is a triable issue of fact whether UCLA owed a duty to protect based on statutes requiring employers to address credible threats of violence in the workplace.  (See *Franklin, supra,* 151 Cal.App.4th at p. 259 ["Labor Code section 6400 et seq. and Code of Civil Procedure section 527.8 . . . require . . . that an employer take reasonable steps to address credible threats of violence in the workplace"].)  Rosen has produced no evidence she was an employee of UCLA, nor has she provided any authority that the workplace statutes she cites extend to college students who are not otherwise employed by their school.[13]

## DISPOSITION

The petition is granted.  Defendants shall recover their costs on their petition.


ZELON, J.

I concur:


STROBEL, J.[*]

---

[12]     Rosen cites two other pieces of evidence that purportedly show the terms of her implied contract with UCLA included a duty to protect.  First, she cites language from the Student Conduct Code providing that any individual who "commits an act of violence or has threatened to commit such an act" may be suspended from the university and barred from its property.  This language merely permits the university to take certain conduct in response to violent behavior; it does not qualify as a specific promise to undertake a legal duty to protect students from campus violence.  Second, she cites evidence indicating that UCLA imposes an individual surcharge to pay for student mental health services.  We fail to see how charging a fee for mental health services qualifies as a contractual obligation to protect students from third party misconduct.

[13]     Because we conclude that Rosen failed to establish UCLA owed her a legal duty under the circumstances presented here, we need not consider UCLA's alternative arguments.

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

34

PERLUSS, P.J., Dissenting.

"Welcome to one of the most secure campuses in the country" proclaims the brochure entitled "The Necessities for Bruin Families," addressed to parents who are thinking about sending their children to UCLA. Other promotional materials assure prospective students and their families that "UCLA is committed to maintaining a safe and respectful learning environment and takes an unwavering stand against any act that violates the True Bruin values." To the same effect, the January 2008 Report of the University of California Campus Security Task Force declared in its opening line, "There is no greater priority for the University of California system than the safety and security of students, faculty, staff, and visitors." That same report concluded by observing, "[w]hile no campus can be immune from the threats of violence that exist in larger society, the University should do everything feasible to create safe and secure campuses."

The Regents of the University of California is not alone in announcing campus safety as one of its primary responsibilities. Throughout the country, professional organizations attempting to identify best practices for preventing and responding to campus violence have recognized, although the statistical risk of serious violence on campus may be low, the potential consequences can be devastating and long-lasting. (See, e.g., Campus Violence Prevention and Response: Best Practices for Massachusetts Higher Education, Report to Massachusetts Department of Higher Education (2008) <htt://www.mass.edu/library/reports/campusviolencepreventionandresponse.pdf> [as of Oct. 7, 2015].) Accordingly, these professionals advise, "Colleges must respond proactively to the risk, as parents rightly expect a special level of care for their sons and daughters while they are away at school. Thus, it is prudent and imperative that colleges take reasonable steps to ensure the safety of students as well as faculty and other employees." (*Ibid.*)

Are these sentiments simply aspirational or is the relationship between UCLA—or any other college or university—and its students sufficiently "special" that the school and its personnel have an affirmative duty to adopt reasonable procedures to protect their

1

students from foreseeable injury at the hands of third parties acting negligently or intentionally and to implement those measures with reasonable care?  For the reasons set forth below, I would find such a special relationship exists between a college and its enrolled students, at least when the student is in a classroom under the direct supervision of an instructor, and the school has a duty to take reasonable steps to keep its classrooms safe from foreseeable threats of violence.  Accordingly, I respectfully dissent.

1. *The Special Relationship Doctrine and Its Applicability to Colleges and Universities*

a. *The law governing duty generally*

The threshold element of a cause of action for negligence is whether the defendant owed a duty of care to the plaintiff.  (See *Artiglio v. Corning Inc*. (1998) 18 Cal.4th 604, 614.)[1]  "[A] person ordinarily is obligated to exercise due care in his or her own actions so as to not to create an unreasonable risk of injury to others, and this legal duty generally is owed to the class of persons who it is reasonably foreseeable may be injured as the result of the actor's conduct.  [Citations.]  It is well established, moreover, that one's general duty to exercise due care includes the duty not to place another person in a situation in which the other person is exposed to an unreasonable risk of harm through the reasonably foreseeable conduct (including the reasonably foreseeable negligent conduct) of a third person."  (*Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 716; see *Rowland v. Christian* (1968) 69 Cal.2d 108, 112 ["'[a]ll persons are required to use ordinary care to prevent others being injured as a result of their conduct'"]; see generally Civ. Code, § 1714, subd. (a) ["[e]veryone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself"].)

---

[1]    The additional elements of a cause of action for negligence are breach of duty, proximate cause and damages.  (*Artiglio v. Corning Inc.*, *supra*, 18 Cal.4th at p. 614.)

2

Whether a duty of care exists in a particular case is a question of law decided by the court. (*Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 237-238 (*Delgado*); *Morris v. De La Torre* (2005) 36 Cal.4th 260, 264.) That question, however, must be evaluated at a relatively broad level of factual generality to "preserve the crucial distinction between a determination that the defendant owed the plaintiff no duty of ordinary care, which is for the *court* to make, and a determination that the defendant did not breach the duty of ordinary care, which in a jury trial is for the *jury* to make." (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 772.) As the *Cabral* Court explained, "the court's task in determining duty 'is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed . . . .'" (*Ibid.*)

The issue of duty, moreover, is essentially one of public policy: "'A judicial conclusion that a duty is present or absent is merely "'a shorthand statement . . . rather than an aid to analysis . . . . "Duty," is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.'"'" (*Beacon Residential Community Assn. v. Skidmore, Owings & Merrill LLP* (2014) 59 Cal.4th 568, 573, quoting *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 397; accord, *Avila v. Citrus Community College Dist.* (2006) 38 Cal.4th 148, 160 (*Avila*).) "[L]egal duties are not discoverable facts of nature, but merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done." (*Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 434.)

b. *The affirmative duty to act with respect to risks not created by the defendant*

As a general matter, there is no duty to come to the aid of another (*Williams v. State of California* (1983) 34 Cal.3d 18, 23), to protect others from criminal conduct of third parties (*Delgado, supra*, 36 Cal.4th at p. 235) or to warn those endangered by such conduct (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1129). A duty to control the conduct of another or to protect or warn persons endangered by such conduct may arise, however, if a "special relationship" exists between the defendant and either the person in need of aid or the third party actor: "A person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another unless there is some relationship between them which gives rise to a duty to act." (*Williams*, at p. 23.) "Such a duty may arise if '"(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives the other a right to protection."' [Citations.] '"This rule derives from the common law's distinction between misfeasance and nonfeasance, and its reluctance to impose liability for the latter."'" (*Zelig,* at p. 1129; see *Morris v. De La Torre, supra*, 36 Cal.4th at p. 269 ["[a] defendant may owe an affirmative duty to protect another from the conduct of third parties, or to assist another who has been attacked by third parties, if he or she has a 'special relationship' with the other person"].)

"[S]ome relationships by their very nature are 'special' ones giving rise to an 'initial duty' to come to the aid of others, regardless of whether there has been detrimental reliance in a particular case. The relationship between a common carrier and its passengers is just such a special relationship, as is the relationship between an innkeeper and his or her guests, between a possessor of land and those who enter in response to the landowner's invitation and between a psychiatrist and his or her patients." (*Lopez v. Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780, 789.) Like the concept of duty itself, however, the term "special relationship" has no independent significance: "It merely signifies that courts recognize an affirmative duty arising out of the

4

relationship where otherwise no duty would exist [to take affirmative action with respect to a risk not created by the actor]. Whether a relationship is deemed special is a conclusion based on reasons of principle or policy." (Rest.3d Torts, Liability for Physical and Emotional Harm, § 40, com. h, p. 42; see also Rest.2d Torts, § 314A, com. b [affirmative duty to aid or protect often based on finding a "relation of dependence or of mutual dependence"].)

### c. *The applicability of the special relationship doctrine to schools and school personnel*

In *C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 870, the Supreme Court held a school district and its employees have a special relationship with the district's pupils that "impos[es] obligations beyond what each person generally owes others under Civil Code section 1714 . . . . [T]he duty of care owed by school personnel includes the duty to use reasonable measures to protect students from foreseeable injury at the hands of third parties acting negligently or intentionally." That special relationship and the concomitant protective duty, moreover, do not apply only to instructional personnel directly supervising the student but extend generally to all the district's supervisory employees "to the extent their duties include overseeing the educational environment." (*Id*. at p. 871.)

What distinguishes this aspect of *C.A. v. William S. Hart Union High School Dist., supra,* 53 Cal.4th 861, from the case at bar, of course, is that it involved a question of liability for injuries to a high school student, not a college undergraduate; and the Supreme Court, citing cases such as *Hoff v. Vacaville Unified School Dist.* (1998) 19 Cal.4th 925, 935, predicated its recognition of a special relationship on "the mandatory character of school attendance and the comprehensive control over students exercised by school personnel, 'analogous in many ways to the relationship between parents and their children.'" (*C.A.*, at p. 869.)

Reflecting the social and moral conventions of the Vietnam War era and the attendant demise of college administrators' in loco parentis responsibilities, several Court

5

of Appeal decisions—discussed in the majority opinion—have held colleges and universities owe no similar affirmative duty to ensure the welfare of their students. For example, in *Baldwin v. Zoradi* (1981) 123 Cal.App.3d 275 the court affirmed an order of dismissal after the trial court had sustained a demurrer to a college student's complaint that her injury as a passenger in a car involved in an off-campus speed contest was the result of the negligent failure of university personnel to prevent unauthorized drinking in the driver's campus dormitory. The court explained, "Since the turbulent '60's, California colleges and universities have been in the forefront of extension of student rights with a concomitant withering of faculty and administrative omnipotence. . . . [¶] . . . [¶] . . . The transfer of prerogatives and rights from college administrators to the students is salubrious when seen in the context of a proper goal of postsecondary education—the maturation of the students. Only by giving them responsibilities can students grow into responsible adulthood. Although the alleged lack of supervision had a disastrous result to this plaintiff, the overall policy of stimulating student growth is in the public interest." (*Id*. at pp. 288, 291.)

Similarly, in *Crow v. State of California* (1990) 222 Cal.App.3d 192, the Court of Appeal affirmed a judgment for the university defendants in an action by a student assaulted by another student (the starting nose tackle on the university's football team) during a late night keg party at an on-campus dormitory. The court held the injured student's "claim of a university/student special relationship must fail under the facts of this case." (*Id.* at p. 208.) Emphasizing the "distinction between young, immature schoolchildren in grammar and high schools on the one hand and adult students in colleges and universities on the other," the *Crow* court reasoned (while quoting from *Baldwin v. Zoradi*, *supra,* 123 Cal.App.3d at page 287), "'"At one time, exercising their rights and duties *in loco parentis*, colleges were able to impose strict regulations. But today students vigorously claim the right to define and regulate their own lives."'" [Citation.] Given these realities of modern college life, the university does not undertake

6

a duty of care to safeguard its students from the risks of harm flowing from the use of alcoholic beverages." (*Crow*, at p. 209.)

*Tanja H. v. Regents of University of California* (1991) 228 Cal.App.3d 434 (*Tanja H.*) is yet another tragic case of a vicious assault on a young college student by fellow students (once again, members of the university football team) following a dormitory party where alcohol had been served. As in *Baldwin v. Zoradi* and *Crow v. State of California*, the Court of Appeal upheld dismissal of the victim's lawsuit: "As campuses have, thus, moved away from their former role as semimonastic environments subject to intensive regulation of student lives by college authorities, they have become microcosms of society; and unfortunately, sexually degrading conduct or violence in general—and violence against women in particular—are all too common within society at large. College administrators have a moral duty to help educate students in this respect, but they do not have a legal duty to respond in damages for student crimes." (*Tanja H*., at p. 438; see also *Ochoa v. California State University* (1999) 72 Cal.App.4th 1300, 1306, disapproved on other grounds in *Avila, supra,* 38 Cal.4th at p. 160, fn. 5 [student injured during school-organized intramural soccer game by punch thrown by opposing player; "[p]laintiff has shown no basis on these facts for an exception to the *Crow* rule that institutions of higher education have no duty to their adult students to protect them against the criminal acts of third persons"].)

The Supreme Court recognized this case law in *Avila, supra*, 38 Cal.4th at page 158, explaining that colleges and universities do not owe "broad duties of supervision to all their students" to the same extent as public schools owe to elementary, middle and high school students. Nonetheless, the absence of such a generalized affirmative duty to protect college students against third party misconduct in all circumstances, comparable to a public school's duty to its students, did not deter the Supreme Court from recognizing a special relationship between a host college and its own and visiting players in school-supervised intercollegiate athletic events that does not differ in kind from the scope of the duty owed to high school athletes—a duty, shaped by

7

the primary-assumption-of-the-risk doctrine, "to, at a minimum, not increase the risks inherent in the sport." (*Id.* at pp. 162-163.) The *Avila* Court held, "Separate and apart from the body of law governing premises liability claims, another body of law establishes that public schools and universities owe certain non-property-based duties to their students. Public schools have a duty to supervise students [citations], a duty that extends to athletic practice and play [citations]. Although with the demise of the in loco parentis doctrine, colleges and universities do not owe similarly broad duties of supervision to all their students [citations], that development has not limited the recognition that colleges and universities owe special duties to their athletes when conducting athletic practices and games." (*Id.* at p. 158.)[2]

Implicit in the holding of *Avila* is the acknowledgment that we do not need to return to the era of "curfews, bed checks, dormitory searches, hall monitors [and] chaperons," as posited by the court in *Tanja H., supra*, 228 Cal.App.3d at page 438, to identify certain core functions of a college or university where a special relationship with students still exists and where the school and its personnel, because of their students' dependence on them, have an affirmative duty to adopt and implement reasonable procedures to warn students or protect them from foreseeable third party misconduct: That is, the absence of a general duty to their students to ensure their welfare does not mean colleges and universities never have a duty to do so. And if such an affirmative duty exists on the ball field where students are participating in school-sponsored intercollegiate athletics,[3] surely it must also be present to some degree when a student is

---

[2]    The *Avila* Court expressly declined to consider what duties a college or university might owe in the context of intramural competition, the issue presented in *Ochoa v. California State University, supra,* 72 Cal.App.4th 1300. (See *Avila, supra*, 38 Cal.4th at p. 163.)

[3]    Describing the importance of intercollegiate sports to a college, the *Avila* Court stated, "Intercollegiate competition allows a school to, on the smallest scale, offer its students the benefits of athletic participation and, on the largest scale, reap economic and marketing benefits that derive from maintenance of a major sports program." (*Avila, supra,* 38 Cal.4th at p. 162.)

8

in her classroom or laboratory engaging in regular course work under the active supervision of a professor or teaching assistant—the central role of a college or university, at least for its students at the undergraduate level.

The existence of such a protective duty in the classroom setting, moreover, is supported by California's fundamental public policy, which guarantees students and staff at every level of public and private school the right to their physical safety: "[T]he People find and declare that the right to public safety extends to public and private primary, elementary, junior high, and senior high school, and community college, California State University, University of California, and private college and university campuses, where students and staff have the right to be safe and secure in their persons." (Cal. Const., art. I, § 28, subd. (a)(7); cf. *C.A. v. William S. Hart Union High School Dist., supra*, 53 Cal.4th at p. 870, fn. 3.)[4]

That the issue of a college or university's affirmative duties to its students is more nuanced than the all-or-nothing approach suggested by the courts in *Tanja H.* and *Ochoa* is reflected not only in the holding of *Avila* but also in the treatment of the issue in the Restatement Third of Torts, Liability for Physical and Emotional Harm,[5] section 40, which provides in subsection (a) that "[a]n actor in a special relationship with another owes the other a duty of reasonable care with regard to risks that arise within the scope of

---

[4] I recognize the footnote reference to the safe schools provision of the California Constitution in *C.A. v. William S. Hart Union High School Dist., supra*, 53 Cal.4th 861 did not identify this constitutional provision as a source of the high school's protective duty, but rather was cited by the Supreme Court to support, as a matter of public policy, the duty it otherwise found to exist. (*Id.* at p. 870, fn. 3.) Similarly, appellate courts have held the provision is not self-executing; that is, it does not establish an affirmative duty to act or create an independent basis for a private right of action for damages. (E.g., *Bautista v. State of California* (2011) 201 Cal.App.4th 716, 729; *Clausing v. San Francisco Unified School Dist.* (1990) 221 Cal.App.3d 1224, 1236-1237.)

[5] In its opinion in *Cabral v. Ralphs Grocery Co., supra*, 51 Cal.4th 764, the Supreme Court cited the then-recently published Restatement Third of Torts, Liability for Physical and Emotional Harm several times and noted it represented the views "of American jurisdictions generally," although not always consistently with California law. (See *Cabral*, at p. 771, fn. 2.)

the relationship," and in subsection (b)(5) that special relationships giving rise to that duty include "a school with its students," terms that include colleges and their students. (Rest.3d Torts, Liability for Physical and Emotional Harm, § 40, pp. 39-40.) Comment *l* to section 40 explains, "As with the other duties imposed by this Section, it is only applicable to risks that occur while the student is at school or otherwise engaged in school activities. And because of the wide range of students to which it is applicable, what constitutes reasonable care is contextual—the extent and type of supervision required of young elementary-school pupils is substantially different from reasonable care for college students." (*Id.,* § 40, com. *l*, p. 45.)

This affirmative duty, recognized by the Restatement Third of Torts, finds expression in a number of decisions from jurisdictions outside California. (See, e.g., *Boisson v. Arizona Bd. of Regents* (2015) 236 Ariz. 619, 623 [343 P.3d 931, 935] ["Arizona case law . . . indicates a college or university does owe its students a duty of reasonable care for on-campus activities"]; *Mullins v. Pine Manor College* (1983) 389 Mass. 47, 51-52 [449 N.E.2d 331, 335-336] [college owes a duty to its students to take reasonable steps to protect them from foreseeable criminal acts "[t]he fact that a college need not police the morals of its resident students, however, does not entitle it to abandon any effort to ensure their physical safety"]; cf. *Nero v. Kansas State University* (1993) 584 Kan. 567, 584 [861 P.2d 768, 780] ["[a] university has a duty of reasonable care to protect a student against certain dangers, including criminal actions against a student by another student or a third party if the criminal act is reasonably foreseeable and within the university's control"].)[6]

---

[6]     In much the same way that the shift in cultural norms and related relaxation of the custodial relationship between colleges and their students beginning in the late 1960's led to a reevaluation of principles of tort liability affecting a college's duty of care to its students (see *Avila, supra*, 38 Cal.4th at p. 158; see generally Lake, *The Special Relationship(s) Between a College and a Student: Law and Policy Ramifications for the Post In Loco Parentis College* (2001) 37 Idaho L. Rev. 531, 533; Note, *Protecting the Millennial College Student* (2007) 16 S. Cal. Rev. L. & Soc. Just. 431, 436-439), it has been suggested that recent advances in neuroscience, which indicate the human brain

Although no California appellate decision has yet expressly identified a special relationship between a college or university and its students in the classroom setting, I believe it is consistent with existing Supreme Court authority and evolving principles of tort liability to do so. Accordingly, I would recognize an affirmative duty on the part of UCLA and its instructional and administrative personnel to take reasonable steps to keep their classrooms safe from foreseeable threats of violence.[7]

d. *Duty in the circumstances of the underlying lawsuit*

Recognizing the legal duty of a college or university to adopt a reasonable program to protect students in the classroom by identifying and responding to foreseeable threats of campus violence—one that gives appropriate weight to the requirements of federal and state privacy and antidiscrimination laws[8]—would impose no undue burden on The Regents or the other UCLA defendants: All parties agree the University of California has already developed sophisticated, interdisciplinary, threat assessment and

---

does not reach full maturity until a person is at least 25 years old, justify a reassessment of tort principles relating to the university's responsibility for the safety of its students: "The fragility of the adolescent brain, together with the stresses of adjustment and academic life that make students increasingly susceptible to mental disorders that can result in self-injurious or violent behavior, warrants the recognition of a special duty-creating relationship between [institutions of higher education] and their students." (Ramos, *Adolescent Brain Development, Mental Illness, and the University-Student Relationship: Why Institutions of Higher Education Have a Special Duty-Creating Relationship With Their Students* (2015) 24 S. Cal. Rev. L. & Soc. Just. 343, 363-364.)

[7] As discussed, a school's affirmative duty to protect it students extends not only to instructional personnel directly supervising students but also to administrative employees "to the extent their duties include overseeing the educational environment . . . ." (*C.A. v. William S. Hart Union High School Dist., supra,* 53 Cal.4th at p. 871.)

[8] "[**M**]**isunderstanding** about state and federal laws governing the privacy of student educational and medical records, interpretations of disability laws, and negligence laws all create difficulties for campus teams seeking to amass and share information. The laws themselves—when properly understood—create a reasonable and sensible framework in which teams can function [citation]." (Higher Education Mental Health Alliance, *Balancing Safety and Support on Campus: A Guide for Campus Teams* (2012) at pp. 22-23 <http://hemha.org/campus_teams_guide.pdf> [as of Oct. 6, 2015].)

violence prevention protocols.[9]  Indeed, UCLA promotes itself and encourages student enrollment on the basis of campus safety.  And funding for UCLA's program comes in part from the intended beneficiaries, UCLA students, through an increase in mandatory student fees.  Simultaneously, as reflected in the January 2008 Report of the University of California Campus Security Task Force, the University has pursued "extramural funding opportunities to provide complementary and enrichment support for its core student mental health programmatic and services needs."

The Regents's amici curiae confirm the University of California's actions in this regard are not unusual, particularly in the post-Virginia Tech shooting era:  Even without a duty, colleges and universities throughout the country "have voluntarily put in place proactive and effective measures" to reduce the incidence of criminal violence among students by maximizing protective factors and minimizing risk factors.[10]

---

[9]      The impact of governmental immunity principles on this duty is discussed in the following section.  (See generally *Williams v. State of California, supra,* 34 Cal.3d at p. 22 [cautioning against placing "the immunity cart" before "the duty horse"].)

[10]     Whether any particular precautionary safety or security measure was required under the circumstances that existed on a specific campus—a question not raised in the instant case—will necessarily be evaluated on a case-by-case basis:  That issue falls close to the blurred line between determining as a question of law the scope of a college or university's affirmative duty and issues of breach, which are usually questions of fact. (Compare *Verdugo v. Target Corp.* (2014) 59 Cal.4th 312, 338-339 ["[i]n evaluating whether a business is under a duty to provide precautionary measures to protect patrons against potential third party criminal conduct, past California cases generally have looked primarily to a number of factors, including (1) the degree of foreseeability that that danger will arise on the business's premises and (2) the relative burden that providing a particular precautionary measure will place upon the business"] with *Cabral v. Ralphs Grocery Co., supra*, 51 Cal.4th at p. 772 [in determining questions of duty, the court's task "'is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed'"].)

12

2. *Public Colleges and Universities and Governmental Immunity*

Public entities are generally not liable for injuries they cause, either by act or omission. (Gov. Code, § 815; see *Guzman v. County of Monterey* (2009) 46 Cal.4th 887, 897.)[11] The Government Claims Act provides specific, limited exceptions to this general rule. (See *Zelig v. County of Los Angeles, supra,* 27 Cal.4th at pp. 1127-1128 ["'"intent of the [Government Claims Act] is not to expand the rights of plaintiffs in suits against governmental entities, but to confine potential governmental liability to rigidly delineated circumstances"'"].)

Katherine Rosen's negligence claim against the Regents is based on one such exception to the general no-liability rule, Government Code section 815.2, subdivision (a), which imposes vicarious liability on a public entity for its employees' wrongful conduct: "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative." Rosen alleges, and in opposition to the motion for summary judgment presented supporting evidence, that the university employees she has named as defendants, Professor Alfred Bacher, Associate Dean Cary Porter, Dean Robert Naples and Dr. Nicole Green, as well as other UCLA employees, breached the duty owed by UCLA and UCLA personnel to maintain campus classrooms safe from foreseeable threats of violence. As such, Rosen contends, the Regents is liable under the doctrine of respondeat superior (or vicarious liability) for the nondiscretionary conduct of those public employees. (See *Zelig v. County of Los Angeles*, *supra*, 27 Cal.4th at p. 1128 ["[v]icarious liability is a primary basis for liability on the part of a

---

[11] Government Code section 815 provides, "Except as otherwise provided by statute: [¶] (a) A public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person. [¶] (b) The liability of a public entity established by this part . . . is subject to any immunity of the public entity provided by statute, including this part, and is subject to any defenses that would be available to the public entity if it were a private person."

13

public entity, and flows from the responsibility of such an entity for the acts of its employees under the principle of respondeat superior"]; see *Eastburn v. Regional Fire Protection Authority* (2003) 31 Cal.4th 1175, 1180 [Gov. Code, § 815.2, subd. (a), "makes a public entity *vicariously* liable for its employee's negligent acts or omissions within the scope of employment"].)

In its petition for a writ of mandate, the Regents argues the superior court erred in finding "the immunity statutes do not apply here" and failing to award the UCLA defendants summary judgment on immunity grounds, identifying as the basis for this defense Government Code sections 856 and 820.2, as well as Civil Code section 43.92. While these three provisions shield certain aspects of this tragic situation from liability, they do not, either singly or in combination, justify denying Rosen the right to present her negligence claim to a jury.

a. *Government Code section 856*

Government Code section 856, subdivision (a), immunizes the decision reached by UCLA personnel not to seek to involuntarily confine Damon Thompson: "Neither a public entity nor a public employee acting within the scope of his employment is liable for any injury resulting from determining in accordance with any applicable enactment: [¶] (1) Whether to confine a person for mental illness or addiction." Rosen, however, does not challenge that determination, arguing her lawsuit focuses on "careless or wrongful behavior subsequent to a decision respecting confinement," which would not be conduct protected by Government Code section 856. (See *Tarasoff v. Regents of University of California, supra,* 17 Cal.3d at p. 449.) The failure of the Consulting and Response Team to refer Thompson's case to the Violence Prevention and Response Team or to employ many of the other intervention techniques available to it constituted actions outside the scope of this immunity provision.

b. *Civil Code section 43.92*

Civil Code section 43.92 is not an immunity statute. Rather, it limits the liability of a therapist (here, Dr. Green) for failing to protect from a patient's threatened violent

14

behavior to those situations in which "the patient has communicated to the psychotherapist a serious threat of physical violence against a reasonably identifiable victim or victims."  As the majority explains, although Dr. Green was eventually added to the second amended complaint as a Doe defendant, Rosen failed to allege the elements of a failure-to-warn claim pursuant to Civil Code section 43.92—specifically, that a serious threat of harm to Rosen was actually communicated to Dr. Green, either by Thompson himself or by others to whom Thompson had spoken.  (See *Ewing v. Goldstein* (2004) 120 Cal.App.4th 807, 821.)  Accordingly, it appears as if summary judgment was properly ordered as to Dr. Green.  But her removal from the lawsuit as a named defendant does not in any way protect the Regents from liability based on the negligence of other university employees, whether named or unnamed.  (See *Perez v. City of Huntington Park* (1992) 7 Cal.App.4th 817, 820 ["[a] plaintiff seeking to hold an employer liable for injuries caused by employees acting within the scope of their employment is not required to name or join the employees as defendants"]; accord, *County of Los Angeles v. Superior Court* (2002) 102 Cal.App.4th 627, 644; see also Legis. Com. com., 32 pt. 1 West's Ann. Gov. Code (2012 ed.) foll. § 815.2, p. 240 ["[I]t will not be necessary in every case to identify the particular employee upon whose act the liability of the public entity is to be predicated.  All that will be necessary will be to show that some employee of the public entity tortiously inflicted the injury in the scope of his employment under circumstances where he would be personally liable."]; but see *Munoz v. City of Union City* (2004) 120 Cal.App.4th 1077, 1113, disapproved on other grounds in *Hayes v. County of San Diego* (2013) 57 Cal.4th 622, 639, fn. 1 ["unless the employee is identified, the trier of fact will not be able to determine if the elements needed to assert vicarious liability have been proved"].)

c.  *Government Code section 820.2*

Government Code section 820.2 states, "[e]xcept as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or

15

not such discretion be abused." Government Code section 815.2, subdivision (b), extends that discretionary act immunity to the public entity whose employee's conduct is at issue, "Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability." These statutes provide immunity for "basic policy decisions" by government officials, but not "for the ministerial implementation of that basic policy." (*Johnson v. State of California* (1968) 69 Cal.2d 782, 796.)

The *Johnson* Court explained this distinction might be characterized as "between the 'planning' and 'operational' levels of decision-making." (*Johnson v. State of California, supra,* 69 Cal.2d at p. 794.)[12] "[T]here is no basis for immunizing lower level decisions that merely implement a basic policy already formulated. [Citation.] The scope of the discretionary act immunity 'should be no greater than is required to give legislative and executive policymakers sufficient breathing space in which to perform their vital policymaking functions.'" (*Barner v. Leeds* (2000) 24 Cal.4th 676, 685 (*Barner*).)

The Supreme Court in *Barner, supra,* 24 Cal.4th 676 discussed in detail the difference between planning/discretionary and operational/ministerial activities in a

---

[12]  In *Johnson v. State of California, supra*, 69 Cal.2d 782 a government official had placed a 16-year-old boy with homicidal tendencies in Mrs. Johnson's home as a foster child and failed to warn her of the child's dangerous propensities even though the placement officer had notice of the danger. After five days in the home the boy assaulted and injured her. (*Id.* at pp. 784-785.) Mrs. Johnson sued the state, alleging it "[should] have told me I was getting a boy with a criminal and delinquent background." (*Id.* at p. 785, fn. 1.) The trial court granted summary judgment in favor of the state on the ground the placement officer's decision whether to warn of the boy's potentially dangerous propensities was a "discretionary act" protected by Government Code section 820.2. (*Id.* at p. 786.) The Supreme Court reversed, holding the decision to place the boy in the Johnsons' home was a "basic policy decision," but the decision whether to warn of his violent propensities was ministerial. (*Id*. at p. 786.) "[A]lthough a basic policy decision (such as standards for parole) may be discretionary and hence warrant governmental immunity, subsequent ministerial actions in the implementation of that basic decision still must face case-by-case adjudication on the question of negligence." (*Id.* at p. 797.)

16

professional setting—an analysis that guides the application of Government Code section 820.2 immunity in this case.  The issue in *Barner* was whether the immunity for discretionary acts applied to a deputy public defender's representation of a defendant in a criminal action.  (*Barner*, at p. 679.)  The Court held the acts or omissions of a public lawyer, even though they result from professional judgments, do not involve the type of basic policy decisions that are insulated from liability pursuant to Government Code section 820.2.  (*Barner*, at p. 680.)  It explained, "[A] public employee's initial decision whether to provide professional services to an individual might involve the exercise of discretion pursuant to section 820.2," but, "once the employee undertakes to render such services, he or she is not immune for the negligent performance of professional duties that do not amount to policy or planning decisions."  (*Id*. at p. 686.)

The *Barner* Court recognized that deputy public defenders "must exercise considerable judgment in making decisions regarding the type and extent of services necessary to discharge his or her duty of care to clients" (*Barner, supra,* 24 Cal.4th at p. 688) and that "the actual performance of such services ordinarily requires a high level of skill and often involves many choices among complex alternatives."  (*Ibid.*) Nonetheless, the Court concluded, "[E]ven if the initial determination whether to provide representation to a certain class of individuals or to represent a particular defendant is a sensitive policy decision that requires judicial abstention to avoid affecting a coordinate governmental entity's decisionmaking or planning process [citation], and even though a deputy public defender's actual representation of a client requires the exercise of considerable skill and judgment, such representation generally does not involve discretionary acts within the meaning of section 820.2 (i.e., policy or planning decisions). Instead, such services consist of operational duties that merely implement the initial decision to provide representation and are incident to the normal functions of the office of the public defender."  (*Ibid*.)

A public university's decisions to create interdisciplinary behavioral risk assessment protocols and to include specific procedures to identify and respond to threats

17

of campus violence in its programs are unquestionably policy or planning determinations and thus "discretionary" as that term was defined in *Johnson v. State of California, supra*, 69 Cal.2d 782 and *Barner, supra*, 24 Cal.4th 676. By contrast, the actual execution of those programs by university employees with respect to individual students who have been identified as at risk—here, the actions and, more importantly, omissions that Rosen has alleged culminated in her being attacked by Thompson during their classroom laboratory—constitute "subsequent ministerial actions in the implementation of the basic decision" to adopt measures to maintain a safe campus. In sum, even though the UCLA officials involved may have exercised highly skilled, professional judgment in making choices among complex alternatives in their responses to the situation presented by Thompson, Government Code section 820.2 does not bar Rosen's negligence claim.

### d. *Government Code section 835*

As an alternative basis for establishing UCLA's affirmative duty to protect her from foreseeable criminal conduct, Rosen focuses on her status as a business invitee on campus property rather than as a student attending class. As Rosen argues, the common law recognizes a special relationship exists between a possessor of land and those who enter in response to the landowner's invitation. That special relationship imposes an affirmative duty on the landowner to take reasonable steps to protect against foreseeable criminal acts of third parties that are likely to occur in the absence of such precautionary measures. (*Delgado, supra*, 36 Cal.4th at p. 235; *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 674.) However, the Government Claims Act, through Government Code sections 815 and 835, restricts the liability of a public entity as landowner to situations in which "there is some defect in the property itself and a causal connection is established between the defect and the injury" (*Zelig v. County of Los Angeles, supra*, 27 Cal.4th at p. 1135; accord, *Cordova v. City of Los Angeles* (2015) 61 Cal.4th 1099, 1108)—prerequisites that cannot be met in this case. Accordingly, I agree with the majority that UCLA did not owe a duty to protect Rosen based on her status as an invitee onto the property.

UCLA's immunity from premises liability by virtue of Government Code section 835, however, does not insulate it from liability arising from the special relationship between a university and its students while they are in the classroom and the university's concomitant legal duty to adopt and implement a reasonable program to protect students in that setting from foreseeable threats of violence. As the Supreme Court explained in *Avila,* the body of law governing the non-property-based duties schools and universities may owe their students based on the special relationship between them is "[s]eparate and apart from the body of law governing premises liability claims . . . ." (*Avila, supra*, 38 Cal.4th at p. 158.) Thus, the *Avila* Court recognized, while the defendant community college district before it might be protected from a premises liability claim by an immunity statute (there, Government Code section 831.7, rather than Government Code section 835), that immunity provision did not limit the public entity's potential liability arising from other duties, "such as any duty owed to supervise participation in particular activities." (*Avila*, at pp. 157-158.)

To be sure, as the majority suggests (maj. opn., fn. 7), if the Legislature were to eliminate the statutory restrictions on premises liability mandated for all public entities by Government Code section 835, it might not be necessary to rely on the university-student relationship to impose a duty on the university to adopt and implement a reasonable program to protect its students from foreseeable threats of campus violence. But that hypothetical legislative response does not justify rejecting the discrete special-relationship basis for liability presented by Rosen, nor does it relieve the judicial branch of its responsibility to engage in the reasoned development of the common law. (See generally *Tarasoff v. Regents of University of California, supra,* 17 Cal.3d at pp. 436-437; *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804, 813-816.)

3. *Triable Issues of Material Fact Exist as to Whether the UCLA Defendants Breached Their Duty of Care*

After overruling objections presented by the parties, the superior court concluded Rosen had presented admissible evidence demonstrating triable issues of material fact

existed as to whether UCLA personnel had breached their duty to warn Rosen and/or to take reasonable steps to prevent the threat Thompson posed to her. The court listed the following key facts: Rosen was injured in a classroom laboratory under the supervision of a teaching assistant who was employed by UCLA; various members of the campus's Consulting and Response Team who had overseen Thompson's case knew he had mental health issues and had identified his fellow students, including those in his chemistry lab, as the focus of his anger; several of the defendants, including Associate Dean Cary Porter, were aware of or had access to all the information collected on Thompson that established a serious threat of physical violence to all persons Thompson believed were insulting him.[13] Expert declarations filed with Rosen's opposition to the summary judgment motion opined that UCLA's response to the threat Thompson posed failed to meet national standards or to follow UCLA's own rules and procedures and were, as a result, deficient. The UCLA defendants' experts disagreed. The superior court cited these conflicting declarations and the evidence upon which they were based for its ruling there were triable issues of material fact on the issue of breach.

I agree with that assessment of the evidence in the record.[14] In particular, the evidence indicates there may have been an unreasonable failure of communication and lack of coordination among the various professional teams responsible for responding to situations of the type presented by Thompson. As explained by one of Rosen's experts, "Although the CRT [(Consultation and Response Team)] was an appropriate team to

---

[13]    In a report following the attack, teaching assistant Adam Goetz, who had been in charge of the chemistry laboratory, informed the investigating officer Thompson had approached him on several occasions to complain about classmates calling him names and had at least once identified Rosen as one of those students. Prior to the attack Goetz notified Professor Bacher, his supervisor, of Thompson's comments but not Rosen.

[14]    With the exception of the role of Dr. Green, Thompson's treating psychologist, in its petition for writ of mandate the Regents addresses the issue of breach—whether the response to Thompson and his mental health issues was negligent—collectively, referring generally to the evidence regarding the conduct of nonclinical university staff members, whether or not named as defendants in Rosen's operative complaint. Accordingly, I do so as well.

20

assess and care for Damon Thompson as a troubled student in distress, the Violence Prevention and Response Team should have been involved as soon as it became clear that Damon Thompson both posed and uttered threats against others, and certainly after any type of violent behavior was exhibited. When Damon Thompson engaged in violent, threatening, and disruptive behavior at his residence hall on June 3, 2009, he should been placed on the agenda for a meeting held by the Violence Prevention and Response Team. The Violence Prevention and Response Team, in turn, should have recommended interventions that would have mitigated the threat posed by Mr. Thompson."

The Regents may ultimately persuade the finder of fact its employees were not negligent in treating or handling Thompson or in failing to warn or protect Rosen. But breach of duty is ordinarily a question of fact for the jury's determination. (See *Brummett v. County of Sacramento* (1978) 21 Cal.3d 880, 887; see also *Shin v. Ahn* (2007) 42 Cal.4th 482, 500.) This is not one of those exceptional cases where the question of negligence is properly decided by the court as a matter of law. (Cf. *Sprecher v. Adamson Companies* (1981) 30 Cal.3d 358, 373 [reversing summary judgment where "evidence does not conclusively establish that no rational inference of negligence can be drawn under the circumstances of this case"].)

For these reasons I would deny the petition except as to Dr. Green and permit Rosen's case to proceed to trial.


PERLUSS, P. J.


21